**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 12-cv-3157-WJM-MJW

FRESHPACK PRODUCE, INC.,

Plaintiff,

v.

VM WELLINGTON LLC, d/b/a BELLA'S MARKET WELLINGTON,
VM OPERATIONS LLC,
VILLAGE MARKETS HOLDING LTD., LLC,
SAVOY INCOME FUND I LP,
SAMUEL J. MANCINI,
RONALD S. ALLEN, and
ALAN CARMAN,

Defendants.

---

## ORDER GRANTING PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

---

This matter involves a dispute over the enforcement of a statutory trust under the Perishable Agricultural Commodities Act ("PACA" or "Statute"), 7 U.S.C. §§ 499 *et seq*. (ECF No. 1 ¶¶ 21-23.) The matter is before the Court on the request by Plaintiff Freshpack Produce, Inc. ("Plaintiff") for preliminary injunctive relief against VM Wellington LLC, *et al*. ("Defendants"). (ECF No. 28.) Defendants oppose the relief. (ECF No. 24.) Defendants also seek to vacate a Temporary Restraining Order ("TRO") granted on December 6, 2012.[1] (ECF No. 19.)

On December 28, 2012, the Parties supplemented these filings with further materials to assist the Court in disposition of the instant matter. (ECF No. 37; ECF No.

[1] With respect to Defendant's Motion to Vacate, the Court finds this Motion moot at the expiration of the TRO on January 3, 2013. (ECF No. 34.)

39.) Having reviewed the parties' materials, the Court grants Plaintiff's relief consistent with the discussion below.

## I. BACKGROUND

### A. Factual Background

Plaintiff is a Colorado corporation engaged in the business of buying and selling wholesale quantities of produce in interstate commerce. (ECF No. 1.) Defendants are various corporate entities who are licensed to act as dealers of perishable agricultural commodities; as well shareholders, officers, and directors of these entities. (*Id.* ¶¶ 4-10.)

Between January 2, 2012 and September 25, 2012, Plaintiff sold and delivered to Defendants fresh produce worth $263,835.71. (*Id.* ¶ 14.) Of that amount, $74,705.95 remains unpaid ("Unpaid Monies"). (*Id.* ¶ 17.) Each of the outstanding invoices sent by Plaintiff to Defendants contained the following language:

> The Perishable Agricultural Commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(C) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499E(C)). The Seller of these Commodities retains his trust claim over these commodities, all inventories of food or other products derived from these commodities and any receivables or proceeds from the sale of these commodities until full payment is received.

(*E.g.*, ECF No. 6 at 2.) To date, Plaintiff has been unsuccessful in collecting payment from Defendants of the Unpaid Monies. (Sweeney Decl. (ECF No. 5) ¶ 15.)

Importantly, two entities related to Defendants and who received produce from Plaintiff, have filed for bankruptcy protection: VM Odell's LLC ("VM Odell's"), which filed for bankruptcy on September 24, 2012; and VM Williams LLC ("VM Williams"), which

filed for bankruptcy on September 25, 2012. (ECF No. 37 at 1-2.)

Defendant VM Operations LLC ("VM Operations") is the entity that owns and manages the two operating entities that are in bankruptcy. (*Id.*) Prior to the bankruptcy petitions, VM Operations would pay the accounts receivable for those entities, including payments for produce received from Plaintiff. (*Id.* at 2.) Since filing for bankruptcy, VM Operations no longer receives monies from the bankrupt entities without court order. (*Id.*)

Defendant VM Wellington LLC ("VM Wellington") is a separate entity that operates a single store in Wellington, Colorado. (*Id.* at 3.) There are no officers and directors of that entity. (*Id.* at 5.) Defendants allege that VM Wellington has paid Plaintiff (in full) for produce amounting to $3,000. (*Id.* at 5-6.)

Defendant Sam Mancini is: (1) the President and CEO of VM Operations; (2) the President and manager of Defendant Village Market Holding Ltd., LLC ("VM Holding"); and (3) a general partner of Defendant Savoy Income Fund I LP ("Savoy"). (*Id.* at 4-5.) Defendant Ronald S. Allen is the CFO of VM Operations and Defendant Alan Carman is the Vice President of VM Operations, but has no check writing authority for that entity. (*Id*.)

**B. Procedural Background**

On December 4, 2012, Plaintiff brought this action against Defendants alleging statutory violations under PACA. (ECF No. 1.) Contemporaneous with the filing of the Complaint, Plaintiff filed a motion seeking entry of an immediate TRO. (ECF No. 3.) The Court granted that Motion on December 6, 2012. (ECF No. 19.) In the TRO Order, the Court set a hearing for December 20, 2012. (*Id.*) The Court also stated that

"Defendants shall appear and show cause as to why Plaintiff's request for preliminary injunction should not be granted." (*Id*. at 7.)

On December 20, 2012, the Court (1) reserved judgment on whether injunctive relief should be granted; and (2) extended the terms of the TRO for an additional fourteen days through 11:59 p.m. on Thursday, January 3, 2013, pursuant to Fed. R. Civ. P. 65(b)(2). (ECF No. 34.) Because of the complex corporate structure of the Defendant entities, the Court also sought a detailed description from the parties of the "day-to-day operational role" of the entities currently in bankruptcy and "operations of the named Defendants." (*Id.*) The inter-relatedness of Defendants is well-illustrated by the chart contained in ECF No. 24-2.

For the purposes of the present Motion, the Court has reviewed all the originally filed materials, and additional filings since December 20, 2012. The Court thus conducts a similar analysis to what was conducted on December 6, 2012, albeit with the assistance of transcript and the additional filings. *See Emmis Communications Corp. v. Media Strategies, Inc.*, 2001 WL 111229, *2 (D. Colo. Jan. 23, 2001.)

**C. Equitable Jurisdiction**

The Court holds that it has full equitable jurisdiction to grant injunctive relief against each of the named Defendants. Section 499e(c)(5) specifically provides that "[t]he district courts are vested with jurisdiction to entertain actions by trust beneficiaries to enforce payment from the trust." Such language supports the full exercise of the Court's equitable remedies. *See Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 139 (3d Cir. 2000); s*ee also Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 157 (11th Cir. 1990).

Accordingly, there is no limitation as to the power of this Court to bind parties in the present suit.

## II. ANALYSIS

### A. Statutory Scheme: PACA and its Interface with the Bankruptcy Code

This matter involves application of PACA's trust provisions within the context of the Bankruptcy Code, 11 U.S.C. §§ 701 *et seq*. For purposes of background, it is worth addressing these statutes, especially since this matter involves questions of first impression in the District of Colorado.

Congress enacted PACA "to promote fair trading practices" in the marketing of produce. *Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc*., 16 F.3d 1374, 1377-78 (3d Cir. 1994); *In re Kornblum & Co., Inc.*, 81 F.3d 280, 283 (2d Cir. 1996). In 1984, PACA was amended to provide further credit protection to sellers of produce. The amendment provides:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions . . . and any receivables or proceeds from the sale of such commodities or products, shall be held . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . until full payment of the sums owing in connection with such transactions has been received.

7 U.S.C. § 499e(c)(2). "[T]he legislative history and the text of the statute . . . all make clear that trust assets are intended exclusively to benefit produce sellers." *See Best Produce, Inc. v. Shulman–Rabin Marketing, Corp.*, 467 F.3d 238, 242 (2d Cir. 2006).

Relevant to this case, and with respect to PACA's application to the Bankruptcy Code, ordinary principles of trust law apply. *In re Kornblum*, 81 F.3d at 286. Here, this means that Defendants hold legal title to the produce (and its proceeds); but Plaintiff retains an equitable interest in the trust assets pending payment. *Id.* Provided Plaintiff

can show that the Defendant entities fall within PACA as dealers or fiduciaries to the trust, the assets are excluded from any bankruptcy estate. *Morris Okun, Inc. v. Harry Zimmerman*, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993); *Golman Hayden Co. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000).

**B. Entitlement to Injunctive Relief**

To prevail on a motion for injunctive relief, the movant must establish that four equitable factors weigh in his favor: (1) he is substantially likely to succeed on the merits; (2) he will suffer irreparable injury if the injunction is denied; (3) his threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009). If the moving party demonstrates that the second, third, and fourth factors "tip strongly in his favor, the test is modified," and the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue is [ripe] for litigation and deserving of more deliberate investigation."[2]

[2] The Court notes that the continuing validity of this doctrine is questionable in light of *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365 (2008). *See Predator Intern., Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1243 (D. Colo. 2009) (noting that *Winter* may affect the viability of the relaxed standard for success on the merits). However, since *Winter*, the Tenth Circuit has continued to refer to and employ the modified or relaxed injunctive relief standard. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 n.3 (10th Cir. 2009). Accordingly, the relaxed standard appears to continue to be binding law in this circuit. *See San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Servs.*, 657 F. Supp. 2d 1233, 1239 n.1 (D. Colo. 2009) ("[T]he Tenth Circuit appears to recognize the continuing validity of the modified success-on-the-merits formula notwithstanding the *Winter* decision.") In this case, the Court notes that all parties that are bound by the preliminary injunction would satisfy both the traditional *and* the relaxed (modified) standard.

*Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). The moving party bears the burden of persuasion as to each of the four factors relevant to injunctive relief. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

For the reasons that follow, the Court finds that Plaintiff has satisfied the four factors with respect to all of the Defendants, with the exception of putative Defendants VM Wellington and Alan Carman.

1. Irreparable Injury

A party seeking injunctive relief "must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman*, 348 F.3d at 1189. "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003).

Without issuance of preliminary injunction, the Court finds that Plaintiff will likely suffer irreparable harm. Although monetary loss is not typically found to be an irreparable harm, dissipation of PACA trust assets is an exception to the rule. *See Frio Ice,* 918 F.2d at 159 (11th Cir. 1990) (holding that because it is near impossible for a beneficiary to recover outstanding assets once a PACA trust is dissipated, the dissipation of trust assets constitute irreparable harm.); *Tanimura*, 222 F.3d at 139.

Plaintiff has submitted evidence showing that Defendants are likely dissipating trust assets. (Sweeney Decl. ¶¶ 15-16.) Specifically, Defendants' failure to pay the

Unpaid Monies (approximately $74,705.95) demonstrates that Defendants are failing to maintain sufficient assets in the statutory trust. (*Id*.) Such harm to the trust is near irreversible. Moreover, given the recent bankruptcy filings of companies associated with Defendants, it is likely that recovery of monetary damages from Defendants will be difficult. This only heightens the need for the remedy sought by Plaintiff to prevent irreparable harm. (Sweeney Decl. ¶ 10.)

Tipping the scales further in Plaintiff's favor is that injunctive relief will ensure that the *status quo* is preserved. Section 499b(4) provides that once a plaintiff shows that invoices for perishable "commodities" have been delivered, the Statute imposes a statutory "trust over the . . . proceeds from the sale of such commodities." *See also Anthony Marano Co. v. MS–Grand Bridgeview, Inc.*, No. 08 C 4244, 2010 WL 5419057, at *5 (N.D. Ill. Dec. 23, 2010) (holding that the trust arises upon the commencement of the buyer's receipt of produce, and exists throughout the life of the buyer's business).

Here, Plaintiff has established that it delivered produce to Defendants. (Sweeney Dec. ¶¶ 7-10.) Plaintiff has yet to receive payment of the Unpaid Monies. *Id.* Once the produce was delivered, PACA's provisions "kicked in" and the Statute immediately imposed a trust over the Plaintiff's produce (and the proceeds of same). Moreover, PACA provides that Defendants have a statutory duty to maintain these trust assets. 7 C.F.R. § 46.46(e)(1). The Court's relief—in placing proceeds from the trust into escrow until final disposition of the proceedings—maintains the *status quo* and guards against irreparable injury to the trust assets. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *United States v. Adler's Creamery*, 107 F.2d 987, 990 (2d Cir. 1939) (holding its function is to "preserve the *status quo ante* . . . upon a showing that there

would otherwise be danger of irreparable injury."); *SIFMA v. Garfield,* 469 F. Supp. 2d 25 (D. Conn. 2007).

Accordingly, the Court finds that Plaintiff will incur irreparable harm should injunctive relief not be granted. Since Defendants have failed to rebut this finding with evidence to the contrary, this factor tips heavily in Plaintiff's favor.

2. Threatened Injury Outweighs the Injury of the Opposing Party

This factor is an internal balancing test. It requires that "the possible harm to the Plaintiff if the injunction is not entered be balanced against the possible harm to the Defendant[s] if the injunction is entered." *Pelletier v. U.S.*, 2011 WL 2077828, at *3 (D. Colo. May 25, 2011). While not always taken into account, this factor has also been employed to consider the interests of third parties. *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997) (Posner, C.J.) (holding that injunctive relief should be granted if the plaintiff faces "irreparable harm and the defendant very little harm unless *third parties* would be hurt" by the relief).[3]

The harm that Plaintiff will suffer if the injunction is not entered is discussed above (factor 1). Plaintiff will be left empty handed to the sum of $74,705.95. (Sweeney Decl. ¶¶ 7-10.) By contrast, if the injunctive relief *is* entered—and because most of the Defendant entities have a legal obligation to pay the trust assets to Plaintiff—they will *not* suffer harm if the Court orders them to fulfil their obligations under the Statute. *See Tanimura*, 222 F.3d at 140.

On balance, and given the purpose of PACA to preserve trust assets, the Court

[3] Consideration of third parties naturally intertwines with the level of irreparable harm to Plaintiff—*i.e.*, the first factor, above.

finds that the threatened injury to Plaintiff outweighs the injury to *most* of the named-Defendants. The only exception is to VM Wellington. As to this Defendant, there is evidence in the record to suggest that the harm to this entity would be severe if the Court were to grant Plaintiff's relief. Defendants assert that VM Wellington has paid Plaintiff in full for produce amounting to $3,000. (ECF No. 37 at 5-6.) Defendant Mancini also stated at the December 20, 2012 hearing that VM Wellington was itself close to having to file for bankruptcy protection. He indicated that the grant of injunctive relief would be a tipping point for its filing of a bankruptcy petition (much like the other bankrupt entities). Such evidence is not without merit and favors Defendant VM Wellington on this factor—particularly at this stage where formal discovery has yet to commence.

VM Wellington's position is further buttressed by the fact that third parties may be harmed by any injunction requiring VM Wellington to pay trust assets. *See Ayres*, 125 F.3d at 1013. At the hearing, Mancini represented to the Court that to impose injunctive relief against VM Wellington would lead to "punishment [of] people" who were not parties subject to the litigation. (*See also* ECF No. 37 at 1-2) Specifically, Mr Mancini said that Defendant Savoy owns only sixty-nine percent of VM Wellington. The remaining thirty-one percent of VM Wellington is owned by third parties. This evidence was also reiterated in the supplemental filings on December 28, 2012. (ECF No. 37 at 1.) Because Plaintiff did not dispute the effect of injunctive relief on third parties, such evidence points against it.

While the Court sides with VM Wellington on this factor because its injury outweighs that of Plaintiff, it could well be short-lived. As provided for in this Order,

leave is granted to Plaintiff to move for injunctive relief against VM Wellington if (1) further discovery shows a closer relationship between VM Wellington and the trust assets, or (2) if evidence were to be presented that another Defendant entity, which is bound by this injunctive order, transfers trust assets to VM Wellington following the issuance of the preliminary injunction and in an effort to shield such assets from the reach of this Court's order.[4]

Accordingly, and with the exception of VM Wellington, the Court finds that Plaintiff has satisfied this prong of the test for injunctive relief.

3. The Injunction Would Not Be Adverse to the Public Interest

A party seeking a preliminary injunction must show the issuance of the injunction would not be adverse to the public interest. *Heideman*, 348 F.3d at 1188.

Here, this factor weighs heavily in favor of Plaintiff. The purpose behind PACA is to protect suppliers in situations just like this—*i.e.*, where produce has yet been paid. *See* 7 U.S.C. § 499e(c)(1) ("This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest."). Moreover, in passing PACA's provisions, Congress explicitly noted that the statutory trust was created to ensure that suppliers do not suffer when "dealers abandon their business without paying their debts." *See Shepard v. K.B. Fruit & Vegetable, Inc*., 868 F.Supp. 703, 707 (E.D. Pa.1994). Thus, in this case, issuance of the injunction would

[4] The Court notes that Mr Mancini was given liberty to address the Court from the bar table. He represented to the Court that bankrupt parties are in the currently in the midst of a "reorganization plan," which should be finalized towards the end of January, 2013. While he did not agree to extension of the TRO until this time, he did assert that the outstanding amounts of $74,705.95 would ultimately be paid to Plaintiff. As provided for in the Orders below, the parties are to provide a status report regarding the reorganization on January 31, 2013.

not be adverse to the public interest and only promote the purpose behind the Statute.

Accordingly, the Court finds that Plaintiff has satisfied this prong of the test for injunctive relief.

4. Substantially Likely to Succeed on the Merits

To demonstrate a substantial likelihood of success on the merits, Plaintiff is "required to present a *prima facie* case showing a reasonable probability that [it] will ultimately be entitled to the relief sought." *Salt Lake Tribune Pub*., 320 F.3d at 1100.

a. Prima Facie Case: VM Operations' Liability

To determine whether Plaintiff can establish a *prima facie* case, the Court must first construe the term "dealer" pursuant to the Statute. Whether the Defendants are ultimately liable depends on the construction of this term. Relevantly, § 499a(b)(6) defines "dealer" as "any person engaged in the business of *buying or selling* . . . any perishable agricultural commodity in interstate commerce." (emphasis added.) The parties heavily disputed the construction of the phrase "buying and selling."

Defendants argue that VM Operations, *inter alia*, is not a dealer for purposes of the Statute. Specifically, Defendants contend that PACA is inapplicable because VM Operations did not buy produce from Plaintiff—*i.e.*, there was no "buying or selling" as required by § 499a(b)(6). The argument has been put forward that VM Operations merely "purchased" produce on the behalf of other entities, for *e.g.*, VM Williams (one of the bankrupt entities). But Defendants' construction misses the mark. Were the Court to adopt this construction, it would mean that any person could choose to erect a corporate structure where any upstream entity is not directly "buying" produce (but paying invoices); and, at the same time, that same entity is shielded from liability

because it is not a “dealer” since it is not involved in the commercial exchange of actual produce.

Defendants’ construction of this statutory term is far too narrow. Such construction does not achieve the purpose of the Statute. PACA was enacted “to promote fair trading practices,” not circumvent liability with a complex corporate structure (intended or otherwise). *Consumers Produce Co., Inc.* 16 F.3d at 1377-78; *D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90, 93 (2d Cir. 2005) (stating that PACA provides suppliers of produce with remedies to protect against losses; including, “slow-pay and no-pay practices”). As such, the Court broadly construes the word “buying” to include those parties who buy produce both *directly* and *indirectly* from a supplier—*i.e.*, on behalf of others.

Here, there can be no dispute that the VM Operations is a “buyer” under the Court’s construction of § 499a(b)(6) because it bought produce on behalf of the bankrupt entities. VM Operations paid for wholesale quantities of produce delivered from Plaintiff, and the price for that produce exceeded $230,000.00 in 2012. (Sweeney Dec. ¶¶ 10 & 14.) Given these purchases, the Court finds there is a strong likelihood of success for Plaintiff on the merits of its PACA claim against VM Operations.

b. Prima Facie Case: Defendants Other Than VM Operations

In order to attach liability to Defendants other than VM Operations, Plaintiff relies on a fiduciary theory. This theory attaches secondary liability.[5] That is, individuals or entities who are in a position to control PACA trust assets—and who breach their

[5] *Golman–Hayden Co. v. Fresh Source Produce Inc*., 217 F.3d 348, 351 (5th Cir.2000) (discussing at length the distinction between primary and secondary liability).

fiduciary duty to preserve those assets—may be held secondarily liable under the Statute. *See Bear Mountain Orchards, Inc. v. Mich–Kim, Inc*., 623 F.3d 163, 169 (3d Cir. 2010) (listing the relevant authorities). Defendant opposes this theory and argues that it should not be followed in the District of Colorado. But given the weight of authorities supporting the fiduciary theory, the Court finds that it has equal application in this district and to this case. *See Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 706 (2d Cir. 2007)*; Golman-Hayden Co.*, 217 F.3d at 351-52 (an individual in a position to control PACA trust assets is personally liable under PACA regardless of whether he exercised that control); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *Okun,* 814 F.Supp. at 348 (holding that a PACA trust imposes fiduciary liability on a trustee whether that entity is a "corporation or a controlling person of that corporation"). In applying this theory, the Court will address each of the Defendants in turn.

*i. VM Holding*

First, the Court finds that there is evidence that Defendant VM Holding owed and breached fiduciary obligations to Plaintiff for the purposes of a *prima facie* case. Plaintiff has provided sufficient evidence to show that VM Holding is a controlling entity of trust assets. For example, VM Holding was involved in the Credit Application for Plaintiff's produce. It submitted the Credit Application, which was then executed by Defendant Mancini (being President and Manager of same and also CEO of VM Operations). (Supplemental Declaration of Suzanne Sweeney (ECF No. 28) ¶ 5) ("Suppl. Dec.") Moreover, the Colorado Secretary of State's records reflect that VM Operations is a trade name of VM Holding. (*Id*.) Coupled with Mancini's key role in

both these entities, this indicia of control shows the close relationship between VM Holding and VM Operations. In the Court's view, this level of control establishes a likelihood of fiduciary obligations to maintain PACA trust assets for Plaintiff's benefit. *K.B. Fruit & Vegetable*, 868 F. Supp. at 706.

The above showings are also supported by the fact that VM Operations was wholly owned by VM Holding. Because it owned 100 percent of VM Operations; it follows that it also owned 100 percent of its assets. These assets included proceeds from Plaintiff's produce upon which a PACA trust was imposed. This further points towards VM Holding being a fiduciary to Plaintiff and liable under the Statute for dissipation of trust assets. Accordingly, Plaintiff has shown a strong likelihood of success on the merits against VM Holding. *See Sunkist Growers*, 104 F.3d at 283.

*ii. Savoy*

Second, the Court finds that there is also evidence that Defendant Savoy owed and breached fiduciary obligations to Plaintiff for the purposes of a *prima facie* case. The reasons mirror much of that expressed above with respect to VM Holding. Critically, VM Holding is wholly owned by Savoy. VM Holding wholly owns VM Operations. The inter-relatedness of these Defendants is well-illustrated by the chart in ECF No. 24-2. That chart clearly provides a direct line of ownership between Savoy and VM Operations who controls Plaintiff's trust assets. Because VM Operations held trust assets—and as Savoy indirectly owns and controls VM Operations—it follows that Savoy is a fiduciary to Plaintiff with respect to the trust assets. The association between Savoy and VM Operations is only strengthened by the key role Mancini plays in controlling each of these entities—including his role as a general partner at Savoy; a

position that typically holds greater responsibility than limited partners. *See generally In re Snyder*, 184 B.R. 473, 475 (D. Md. 1995). These facts alone would be enough to attach secondary liability to Savoy; but the conclusion is reinforced because Defendants have not discharged their burden to demonstrate that the disputed trust assets were not acquired with proceeds from the sale of Plaintiff's produce. *In re Kornblum & Co.*, 81 F.3d at 280.

*iii. Samuel Mancini*

Third, the Court finds that there is evidence that Defendant Mancini is personally liable because he owed and breached fiduciary obligations to Plaintiff for the purposes of a *prima facie* case. Defendant Mancini is: (1) the President and CEO of VM Operations; (2) the President and manager of VM Holding; and (3) a general partner of Savoy Income Fund I. (ECF No. 37 at 4-5.) He lies at the core of all three entities, which draws parallels with other cases which attach secondary liability. In *Okun,* 814 F. Supp. 346, the court found the defendant personally liable under PACA because he had control of the "day-to-day operations" of an entity that controlled trust assets. *Id.* Similarly, here, Mancini plays a key role in the day-to-day operations of all Defendant-entities who are found liable for the purposes of a *prima facie* case. Plaintiff has thus provided sufficient evidence to show that there is a strong likelihood of success on its claim that Mancini breached his fiduciary obligations for allowing dissipation of Plaintiff's trust assets. *Id.* at 350. *See also Coosemans Specialties*, 485 F.3d at 706.

*iv. Ronald Allen*

Fourth, the Court also finds that there is evidence that Defendant Allen is personally liable as a fiduciary to Plaintiff for the purposes of a *prima facie* case. His

role at VM Operations was CFO. (ECF No. 37 at 5.) Given this position, strong inferences can be made that he was fully cognizant of VM Operations' financial obligations—including those owed to Plaintiff. Indeed, involvement in the financial operations of a company is one of the obligations that comes with being a CFO. As such, Plaintiff has provided sufficient evidence to show that there is a likelihood of success on its claim against Defendant Ronald Allen. *See Reds Market v. Cape Canaveral Cruise Line, Inc.*, 181 F. Supp. 2d 1339, 1343 (M.D. Fla. 2002) (individual in control of PACA trust assets is liable for failure to preserve trust *res* without regard to whether the failure was intentional or not).

*v. VM Wellington*

Fifth, at this stage of these proceedings, the Court finds that there is insufficient evidence to tie VM Wellington to the trust assets. Indeed, Defendant has proffered some evidence to distance itself from both primary and secondary liability. (ECF No. 37 at 5-6.) Such evidence has been addressed with respect to balancing of the harms. Accordingly, the Court does not extend the preliminary injunction to Defendant VM Wellington because Plaintiff does not succeed on this factor.[6]

*vi. Alan Carmen*

Sixth, the Court also finds that there is insufficient evidence to determine that Plaintiff will ultimately prevail against Defendant Carmen. This conclusion derives, in part, from the fact that Carmen did not have check writing authority on behalf of any of the Defendants found to be subject to this order. (ECF No. 37 at 5). This suggests that

---

[6] The Court notes that irrespective of the standard applied as to this factor (traditional or modified), the same result yields. *See Davis v. Mineta,* 302 F.3d 1104, 1111 (10th Cir.2002).

he would have played a marginal role in the day-to-day running of VM Operations (at least with respect to financial obligations). There is certainly nothing filed by Plaintiff, at this stage of the litigation, from which this Court can conclude that Carmen exercised the same level of control over the trust assets as did Mancini (CEO) and Allen (CFO). As such, and at this time, the Court does not extend the preliminary injunction to cover Defendant Carmen.

5. Conclusion on Balancing

In sum, the Court finds that Plaintiff has satisfied the four factors with respect to: (1) VM Operations; (2) VM Holding; (3) Savoy; (4) Samuel Mancini; and (5) Ronald Allen. The Court also notes that Plaintiff has satisfied the modified and traditional standard for the purposes of the merits with respect to these Defendants.[7] However, in applying these standards to (1) VM Wellington and (2) Alan Carmen, the Court finds that Plaintiff has *not* shown a sufficient likelihood of success on the merits (including the modified standard.) This, coupled with the fact that 'balancing of the harms' weigh in favor of VM Wellington further precludes extension of the injunction to this Defendant. As such, and at this stage of the proceedings, VM Wellington and Alan Carmen are not bound by the Court's Orders below. *See Westar Energy,* 552 F.3d at 1224.

## B. Ability Not to Pay

Defendants assert that any injunctive relief is unwarranted due to the fact that Defendants do not have the ability to pay. (ECF No. 24 at 9.) The Court finds this

[7] To the extent that the modified standard applies, the Court notes that it is relevant here for two reasons. First, the other traditional factors "tip strongly" in Plaintiff's favor. Second, the grant of injunctive relief preserves the status quo. *See Davis* 302 F.3d at 1111*; Wells Fargo Bank v. Louis Maynahonah* 2011 WL 3876519 (W.D. Oklahoma Sept. 2, 2011.)

argument of little relevance to whether injunctive relief should be granted against most of the Defendants. If anything, Defendants argument on this point only reinforces the need for injunctive relief against them, with the exception of VM Wellington.

**C. Chapter 11 Payment Plan**

Defendants finally contend that any injunctive relief in favor of Plaintiff would be moot because Plaintiff will soon receive payment via a Chapter 11 payment plan with respect to the bankrupt entities. (ECF No. 24 at 4.) Further, Mancini represented to the Court that the bankrupt parties are currently in the midst of a "reorganization plan," which should be finalized towards the end of January, 2013. While he did not agree to extension of the TRO until such time, Mancini did assert that the outstanding amounts of $74,705.95 would be paid to Plaintiff. As provided for in the Orders below, the parties are to provide a status report regarding the reorganization on January 31, 2013.

## III. CONCLUSION

For the reasons set forth above, Plaintiff's request for preliminary injunctive relief (ECF No. 1) is GRANTED with respect to named-Defendants below. The Court therefore ORDERS as follows:

1. Defendants (1) VM Operations LLC, (2) Village Markets Holding Ltd., LLC, (3) Savoy Income Fund I LP, (4) Samuel J. Mancini, and (5) Ronald S. Allen, and their officers, agents, servants, employees, attorneys, and financial institutions, are all hereby restrained from dissipating and/or disbursing any and all trust funds, monies, and/or liquidated interests of any type whatsoever now in their possession or under their control that are generated by or resulting from the sale of perishable agricultural commodities, as well as any and all trust funds and/or

monies hereafter received, except for payment in full to Plaintiff's counsel, until compliance with ¶ 2, below;

2. On or before January 11, 2013, Defendants shall deposit into an interest bearing escrow account with a federally-insured financial institution the amount of $74,705.95. No withdrawals from this account shall be made without Court approval, except for payment to Plaintiff's counsel;

3. To the extent that it has not been already performed, not later than January 11, 2013, Defendants shall provide Plaintiff's counsel with a verified and detailed accounting of business operations, including records concerning Defendants' assets, bank accounts, accounts receivable, accounts payable, including a list of all PACA Trust Creditors, operating expenses and sales;

4. The $74,705.95 in PACA trust assets belonging to Plaintiff and in the possession of Defendants shall serve as Plaintiff's security for purposes of Fed. R. Civ. P. 65(c). No additional security need be provided;

5. Leave is granted to the parties to provide the Court with a Joint Supplemental Status Report on January 31, 2013, which outlines the outcome of the "reorganization plan" addressed by Defendant Mancini at the hearing on December 20, 2012. This status report should indicate whether full payment to Plaintiff of trust assets has been made by Defendants (or any other entity bankrupt or otherwise);

6. Leave is granted to Plaintiff to move for additional injunctive relief against VM Wellington if (1) further discovery shows a closer relationship between VM Wellington and the trust assets, or (2) evidence presents that another Defendant

entity, which is bound by this injunctive relief Order, transfers trust assets to VM Wellington following the issuance of the preliminary injunction; and

7. This Order shall remain in full force and effect from the date of entry or until further Order of Court.

Dated this 3rd day of January, 2013.

BY THE COURT:

William J. Martínez
United States District Judge